PEOPLE *v.* HARMON.

1. LARCENY—EVIDENCE—SUFFICIENCY—INFERENCES.
   In a prosecution for the larceny of certain. automobile tires from a railroad company's warehouse at point of destination, evidence *held*, sufficient to sustain an inference that the tires were not only delivered to the railroad company at the shipping point, but that they were also received at its warehouse from which it is claimed by the people they were stolen.

2. SAME—EVIDENCE—IDENTIFICATION.
   The admission in evidence of the shipping bill, bill of lading and the checking list, after sufficient identification, *held*, proper.

3. SAME—DUTY OF FINDER OF LOST PROPERTY—INSTRUCTION.
   Where the defense was that the tires alleged by the people to have been stolen had been found by defendant upon land leased by him, and had been removed by him, to preserve them, a requested instruction to the effect that under such circumstances, defendant had no duty to inquire or search for the owner, *held*, properly refused, in view of 2 Comp. Laws 1915, §§ 7446, 7450, requiring the finder of property to advertise same.

Exceptions before judgment from Ingham; Wiest (Howard), J. Submitted October 14, 1921. (Docket No. 185.) Decided December 21, 1921.

James Harmon was convicted of larceny. Affirmed.

*Seymour H. Person,* for appellant.

*Merlin Wiley,* Attorney General, and *J. A. Boice,* Prosecuting Attorney, for the people.

STONE, J. In March and April, 1920, James Harmon was engine foreman and yard conductor, and

Bert F. Coe was assistant conductor in the employ of the Grand Trunk Railroad Company at Lansing, Michigan. An information was filed charging them with the larceny of 16 Fisk automobile tires of the value of $250. Mr. Harmon was tried and convicted. His case is here on exceptions before sentence.

It is the claim of the people that on February 25, 1920, Robert Scarf, shipping clerk for the Detroit branch of the Fisk Tire & Rubber Company, prepared a shipment of 32 Fisk tires, of various sizes, for the Giles Tire service of Lansing, Michigan; that these tires were arranged in 9 bales; that Mr. Scarf called up the cartage company and consigned the tires in the usual course of business to the consignee for whom they were prepared; that they were shipped over the Grand Trunk railroad. It is the further claim that the shipment was received at the Grand Trunk station in Detroit and loaded in Lansing car No. 47, and that the car arrived at Lansing, and the tires were checked out as received at Lansing in the usual manner. This date was March 7th. It is also claimed that about two days later the Giles Service Company called for these tires and it then developed that they were short 7 bales, a shortage of 25 tires. It is also claimed that on April 9, 1920, 14 new tires corresponding to the tires shipped as above were found in the cellar of Earl Finkbinder's home in Lansing, where they had been placed by Mr. Harmon and later two more tires were taken off the car of one Coe, which were with the 14 found when they first came into the hands of the defendant James Harmon. It is claimed these 16 tires corresponded with 16 of the tires missing in the Giles shipment, and that no shipment of a similar lot of 16 tires, or containing 16 similar tires, was ever shipped from the Detroit Fisk branch, and that the Detroit branch furnishes all tires shipped in Michigan. It is admitted that these tires were brought

to Mr. Finkbinder's home by the defendant about three weeks before April 8, 1920. The claim of the people is that Mr. Harmon and Mr. Coe stole these tires.

The claim of the defendant is stated by his counsel as follows:

"The evidence on behalf of respondent tends to show that the Grand Trunk railroad owned a piece of land bordering its tracks, some 30 or 40 rods from its freight shed. In the southeast corner of this piece of land were some stockyards. The balance of the land was not used by the Grand Trunk for railroad purposes and had for the last three years been leased by the Grand Trunk to the respondent and used by the respondent as a garden spot. * * * The respondent introduced evidence showing that one morning in the latter part of January or the first of February, in passing from his home to his work, he crossed his garden patch and saw some automobile tires lying there in a hole; that these tires were partially covered with snow so that only one or two of them showed; that he left them there a week or ten days; that during this time nobody removed the tires and that therefore he removed the tires from the garden spot and put them in his garage. At the time he put the tires in his garage his automobile was in the repair shop. About the middle of February he returned his car to the garage and not having room for the tires and the car, he spoke to Finkbinder, from whom he rented the garage, about them and Finkbinder permitted him to store them in his (Finkbinder's) cellar. The tires were in Finkbinder's cellar about three weeks when respondent was called to the police station where he met Detective O'Brien and was asked in reference to the tires. He then told O'Brien about finding the tires as herein set forth. Respondent also told Finkbinder the same detailed statement in reference to the tires at the time they were placed in Finkbinder's cellar. Respondent has never claimed the tires as his own. In fact, whenever he referred to the tires both before his arrest, at the time of his arrest, and since his arrest, he has al-

ways detailed the same history as to the method in which the tires came into his possession. It is true that he never advertised the tires in the lost and found column of the papers, nor did he ever ask the Grand Trunk if any tires had been lost by that road."

It is the claim of defendant that there should have been a directed verdict in his favor because there is no evidence that any crime has been committed. This contention seems to be principally based upon the theory that there is no evidence that the tires were actually delivered to the Grand Trunk Railroad Company in Detroit, and the further claim that there is no evidence that they were actually received by the railroad company in Lansing.

Mr. Scarf testified to the putting up of the order and that—

"When these tires were ready I called up the cartage company and the last I saw of them was when I rolled them on his wagon at the door of the shipping department. That was February 25th. The cartage man brought back the bill of lading, signed by the railroad company, dated the 26th or 27th. I turned it over to the billing clerk. The shipment left our store room the 25th and it was delivered to the railroad the next morning, the 26th. That has the Grand Trunk railroad stamp on it. In the nine bales that went from our company to the cartage company there were 32 tires and these tires cover a portion of that shipment and the bales are described in the shipment. I have investigated all the records and find no other loss or claim or shipment of a similar character. These 16 tires and the 7 at the Grand Trunk do not make up the complete invoice; there are 9 tires to be recovered yet. The Detroit branch furnishes all tires used in Michigan and they are shipped from Detroit."

Mr. Reedy testified in part:

"February 26, 1920, I received two shipments of 9 bales of tires from the Fisk Rubber Company consigned to Giles Tire Service, Lansing. I got my sig-

nature here where I loaded 9 bales of tires in a special Lansing car, No. 47. * * *

"Q. You don't know anything about it except what your records show, you don't remember anything about it do you?

"A. No, except what the records show.

"Q. And the usual thing would have been for you as checker to have turned it over to the loader and for the loader to have put it on the truck car, wouldn't it?

"A. Yes, sir.

"Q. And that is probably what happened in this case isn't it?

"A. I presume. I have no personal knowledge as to whether these tires ever went on a car or not. We have a system of tickets but I cannot tell whether I got the ticket back or not.

"Q. So you don't know?

"A. No."

Redirect-examination by Mr. Boice:

"Our records indicate it was loaded. The handing to the loader and loading it to the car was almost simultaneous, all at one time. I was right there. I loaded this myself and checked up the bills."

Later on he testified:

"I loaded this particular shipment into 47 car myself."

Homer Phillips, a checker at the station at Lansing, testified in part:

"I remember having some tires pass through my hands March 7th. I had a checking list and as the loader counted them I checked them out. The circle around the item 'Giles Tire Service, 9 Bales rubber tires' indicates that I checked 9 bales out of the car.

"Q. Does that mean that you checked out the entire 9?

"A. It indicates there was supposed to be nine in the shipment and the loader who loaded the 9 on, called 9 bales of tires and I checked it right there with the circle."

On cross-examination:

"*Q.* But you would stand there with this list in your hand?

"*A.* Certainly.

"*Q.* And the loader—you would have your pencil in your hand?

"*A.* Certainly.

"*Q.* And the loader would say 15 drums, you would put a ring around there, that is if he called that off, 15 drums you would check that off?

"*A.* Yes.

"*Q.* That is all you know about it, absolutely, is what he said?

"*A.* Certainly, that is all."

Recross-examination by Mr. Person:

"*Q.* You don't know how many bales there were do you?

"*A.* Not exactly, only from what they called of course."

After this testimony was given we do not think it was a far-fetched inference that these tires were not only shipped from Detroit over the Grand Trunk, but that they were received at its warehouse in Lansing. Especially is this so as there is no question about part of this shipment finding its way to the warehouse.

Error is assigned upon the receipt of the shipping bill, the bill of lading and the checking list, but we think each of these papers was sufficiently identified to make it competent evidence. Counsel say:

"It is the claim of the respondent that the charge of the court was unfair to the respondent, argumentative as to several paragraphs and sentences; that said charge in effect amounted to a directed verdict of guilty; that the court nowhere and at no time in said charge submitted to the jury the theory of respondent's defense or the questions of fact involved therein; that in no part of the charge is the theory of the law in reference to lost articles and the rights of the finder

in reference thereto explained and submitted to the jury."

Counsel preferred 11 written requests to charge. These were not given except as covered by the general charge. Many of these requests related to the rights and duties of the finder of lost property. We quote two of them:

"9. If you find that these tires were located on land on which the respondent had a lease and a right of possession and a right of use, then I charge you that the respondent had the right to remove the tires from such lands of his and that he had no duty to inquire or search for the owner in any way, and that in so removing said tires it was proper for him to store and preserve them either on his own property or by an arrangement with others, and that such storing and preserving of such property is no evidence of a larceny but is the carrying out of the honest duty of the respondent.

"10. I charge you that if the respondent found these tires on lands which he had the right to occupy, then in moving the tires from said land and preserving them at some other place, he was but acting within his rights and he had no duty to make inquiry of the Grand Trunk or anybody else as to the ownership of the tires."

Whatever may be the decisions in other commonwealths these requests to charge were not correct statements of the law in this State. See chapter 141, 2 Comp. Laws 1915, and especially sections 7446 and 7450.

The charge was a very long one. Among other statements the jury was told:

"Now, such intent, if he found them as he claims, you would have to find was formed by him at the time he first removed them, not afterwards. If his purpose in removing them from the pit, when he first found them, was to remove them from the pit and convert to his own use and deprive the owner of them

217 Mich.—2.

permanently then he had a felonious intent. But if he removed them from the pit for the purpose of preserving them, so the owner might have them later, and later on formed the purpose of stealing them, he would not be guilty of the crime of larceny.

"Now, that may sound very fine drawn to some of you people, but that is the law, because under our statute, if the finder of property takes no steps as pointed out in the statute to give notice to the owner or to find the owner, and after finding and having the property in his possession forms the intent to convert it to his own use, he is guilty of another offense but not of larceny.    *    *    *

"Now the mere fact that he did not report it to the police or that he did not advertise it does not make him guilty of the crime here charged, but what he did and what a person of average intelligence and right thinking would have done under the same circumstances, may be considered by you upon the question of his intent. He says he took the automobile tires and stored them and he tells you where they were placed. What was his purpose? A man under the circumstances here disclosed by the testimony and the respondent might take the automobile tires and store them, holding them for the owner. When he removed them from where he says he found them, what was his purpose? Was it to hold them for the owner or to deprive the owner of them and take them himself? If his purpose was to hold them for the owner and he had nothing to do with placing them in the pit where he found them, then he would not be guilty of any larceny, but if at the time he found them or at the time he removed them from the place where he found them, his purpose was to convert them to his own use and deprive the owner thereof permanently, whoever the owner might be, then he would be guilty of larceny provided you find that these tires were part of the shipment from Detroit.    *    *    *

"He claims that the tires in court, 16 tires here were found by him on his ground in that pit, along the last of January or the first of February, 1920. Now, if he so found them, those tires are no part of the shipment made from Detroit on the 26th day of February, 1920. I am calling your attention to these

matters because of the issue of fact to be decided by you from the evidence. * * * If you find that the tires here in court were in the possession of the respondent previous to their shipment from Detroit, or the time they could have reached the city of Lansing, then your verdict must be not guilty."

The case was carefully and ably tried. So far as the requests of counsel were proper to be given to the jury, they were fully covered by the general charge. The jury simply did not believe the story of the defendant.

The conviction is affirmed, and the case is remanded for further proceedings.

STEERE, C. J., and CLARK, BIRD, and SHARPE, JJ., concurred. MOORE, WIEST, and FELLOWS, JJ., did not sit.